45 A.3d 889

Gloria DIXON, et al.

v.

STATE of Maryland.

No. 187, Sept. Term, 2011.

Court of Special Appeals of Maryland.

June 6, 2012.

Paul V. Jorgensen, Middletown, MD (Norman C. Usiak, Frederick, MD, on the brief), for appellant.

Michael O. Doyle (Douglas F. Gansler, Atty. Gen., on the brief), Pikesville, MD, for appellee.

Panel: MATRICCIANI, WATTS and JAMES R. EYLER (Retired, Specially Assigned), JJ.

MATRICCIANI, J.

This appeal arises from the death of fifteen-year-old Dominick Dixon. On September 24, 2009, appellants—Gloria M. Dixon, Ronald Eugene Dixon, and the Estate of Dominick Dixon—filed a negligence complaint against appellee, the State of Maryland, in the Circuit Court for Baltimore City. Appellants alleged that Robert Crosby, after having been released from prison two years earlier, murdered Dominick. The complaint sought money damages relating to the State's alleged negligence in supervising Crosby after his release from prison. The State filed a motion for summary judgment on January 31, 2011, arguing that it owed no tort duty to Dominick Dixon to protect him from harm by Crosby. On March 2, 2011, the circuit court entered an order granting the motion and entering judgment in favor of the State. Appellants' timely appeal followed.

### QUESTION PRESENTED

Appellants present one question for our review, which we have rephrased as follows:

Did the circuit court err in granting summary judgment in favor of the State because it owed no tort duty to appellants?

For the reasons that follow, we answer no and affirm the judgment of the circuit court.

### FACTUAL AND PROCEDURAL HISTORY

This appeal involves three "units" of the Maryland Department of Public Safety and Correctional Services: (1) the Division of Corrections ("DOC"); (2) the Maryland Parole Commission ("MPC"); and, (3) the Division of Parole and Probation ("DPP"). Md.Code (1999, 2008 Repl.Vol.), § 2–201 of the Correctional Services Article ("CS"). Each of these units has a role to play in the confinement, conditional release, and supervision of convicted criminals. DOC operates incarceration facilities for the confinement of sentenced criminals. *Watkins v. DPS & CS,* 377 Md. 34, 37, 831 A.2d 1079 (2003). MPC has the exclusive power to authorize the parole of an incarcerated person. CS § 7–205(a)(1). MPC is also responsible for issuing warrants to retake parolees who are charged with violating a condition of their parole. CS § 7–206(2). DPP is responsible for supervising the post-incarceration conduct of parolees and individuals released on mandatory supervision. CS §§ 6–104(1)(i)–(ii). This appeal concerns DPP's incompetent supervision of Crosby after his release from prison.

In 1976, the Criminal Court for Baltimore City sentenced Crosby to a thirty-five year term of incarceration for the rape of a thirteen-year-old girl. DOC released Crosby from prison on mandatory supervision on July 31, 1999.[1] Mandatory supervision is a non-discretionary release that must be afforded to any inmate who has served the full term of a sentence of more than eighteen months. CS § 7–501. Crosby's freedom was short-lived, however. After he was arrested and charged

---

1. DOC released Crosby early after applying "diminution credits" to the expiration date of his full term of confinement. CS §§ 3–704 and 7–501(3).

with assault and weapons crimes in February of 2000, MPC issued a retake warrant, and Crosby was remanded to DOC's custody. He remained in prison for the next four years. During that time, MPC denied two of Crosby's requests for parole. In one denial, the MPC explained:

> Prior psychological reports were uniformly negative; he's a pattern offender for sex offenses with minor children and violated [mandatory supervised release] by drug use. He's still deemed a threat to public safety.

Crosby became eligible for a second release under mandatory supervision in 2004. Initially, Crosby requested to live with his cousin in Washington, D.C. Before his release, however, the Interstate Commission for Adult Offender Supervision denied DPP's request to transfer responsibility for Crosby's supervision to Washington, D.C. authorities.[2] DPP, in turn, denied Crosby's request to live in Washington, D.C. upon his release. Crosby then notified DPP that he would live at 2721 Parkwood Avenue in Baltimore.

On September 24, 2004, DOC released Crosby for a second time on mandatory supervision. Appellants allege that Crosby moved into his cousin's home in Washington, D.C. in violation of the terms of his mandatory supervision. The mandatory supervision release certificate imposed the following conditions:

1. Report as directed to and follow your Parole Agent's instructions.
2. Work regularly.
3. Get permission before:
 a. Changing your home;
 b. Changing your job; or,
 c. Leaving the State of Maryland.
4. Obey all laws.

---

**2.** The Commission is a joint agency of compacting jurisdictions, including Maryland and Washington, D.C., that coordinates the interstate movements of convicted criminals released to the community under jurisdiction of the courts. CS §§ 6–206(3) and 6–206(g),(j).

5. Notify your parole agent immediately if you are arrested.

6. You shall not illegally possess, use, or sell or have under your control any narcotic drug, "controlled dangerous substance," or related paraphernalia.

7. You shall not own, possess, use, sell, or have under your control any dangerous weapon or firearms of any description without the approval of the Maryland Parole Commission.

8. You shall so conduct yourself as not to present a threat to yourself or others.

9. Special conditions: See front of certificate.

Two special conditions were listed on the front of the release certificate: "No unchaperoned contact with any minor children," and "Subject to attend Special Offenders Clinic or any other therapy program as directed by his agent." Crosby was also required to register as a sex offender under the Maryland Code (2001, 2008 Repl.Vol., 2011 Supp.), § 11–701 through 11–721 of the Criminal Procedure Article ("CP").

DPP supervised Crosby from its sex offense unit in Baltimore. DPP classified Crosby as an individual who required "intensive" supervision based on his criminal history. DPP's field manual prescribed the standards for supervising Crosby. Agents were instructed to verify that Crosby lived at his approved Baltimore address within twenty days of his release. They did not. Thereafter, agents were required to verify Crosby's residence with home visits every four months. They did not. Crosby was instructed to report to DPP's Baltimore office twice a month for face-to-face meetings. Often times, he did not. During Crosby's mandatory supervision, DPP should have conducted forty-eight face-to-face visits with Crosby, including additional visits to verify his home address every four months. DPP's efforts in supervising Crosby fell well short of the standards set forth in its field manual.

From his release in September of 2004 through his incarceration in February of 2006, a DPP employee, Jean Quickley, was Crosby's Parole Agent. Agent Quickley made at least

seven visits to the Baltimore address, but failed to meet Crosby or otherwise confirm that he lived there on any of those visits. Crosby failed to report to DPP's Baltimore office for face-to-face visits at least fourteen times. Occasionally, he would call agent Quickley with an excuse; other times he simply failed to report as directed. Crosby also missed two appointments for group therapy in DPP's Special Offender's Clinic. Crosby's failure to report for face-to-face meetings and failure to attend the Clinic violated his mandatory supervision release order. Still, DPP took no corrective action.

Then, on November 23, 2005, a Detective with the Baltimore Sex Offender Registry e-mailed Agent Quickley. The Detective asked:

> Do you know where this guy [Crosby] is? He has missed his anniversary date and people at his residence state that he has cancer and is living in DC.

After receiving the e-mail, Agent Quickly called Crosby's employer. The employer's records indicated that Crosby lived in Temple Hills, Maryland. DPP never verified that Crosby lived in Temple Hills or transferred responsibility for his supervision to an agent in a DPP office for Prince George's County. Nor did it investigate whether Crosby was living at the unapproved Washington, D.C. address. If Crosby moved from Baltimore to Temple Hills or Washington, D.C. without notifying DPP, that too violated his mandatory supervision release order.

Finally, on December 16, 2005, Agent Quickley requested that the MPC issue a retake warrant for Crosby's arrest for his failure to comply with the conditions of his release order. Crosby was arrested under the MPC's retake warrant on February 15, 2006. He was later released from prison after the MPC found Crosby not guilty of violating the terms of his release in a hearing on April 18, 2006.[3] Thereafter, Crosby remained under the supervision of Agent Quickley.

---

3. The record does not reveal why the MPC found Crosby not guilty of the alleged violations.

From April through September of 2006, Crosby reported sporadically for his required face-to-face meetings. Agent Quickley continued to attempt home visits to Crosby's Baltimore address, despite evidence that he was in fact living in either Temple Hills or Washington, D.C. No DPP Agent ever attempted to visit Crosby at the Temple Hills or Washington, D.C. addresses. Crosby's last contact with Agent Quickley was an in-person meeting on August 24, 2006. Thereafter, he missed reporting dates on September 7 and 14, 2006.

Dominick Dixon was killed by strangulation on September 24, 2006 in Washington, D.C. His naked body was found in an abandoned house across the street from Crosby's cousin's house. Washington, D.C. police arrested Crosby, and he confessed to killing Dominick. Crosby stood trial on February 19 through 26, 2008. Although the jury returned a verdict of not guilty, the State conceded for the purposes of this appeal that Crosby killed Dominick Dixon. Crosby returned to DOC custody on March 6, 2008 under a retake warrant issued by MPC for violating the conditions of his mandatory supervision release order. Crosby has since served his entire sentence in the 1976 rape case, and was released from the State's custody to unknown whereabouts.

On September 24, 2009 appellants filed a complaint for wrongful death and survival actions against the State and Crosby, and a claim of intentional infliction of emotional distress against Crosby alone. The State moved to dismiss the complaint for failure to state a claim, arguing in part that it had no tort duty to protect Dominick Dixon from harm by Crosby. In an order entered on May 26, 2010, the circuit court denied the State's motion. After discovery, the State filed a motion for summary judgment, making the same duty argument as in its earlier motion to dismiss. After a hearing, the circuit court entered an order granting the State's motion for summary judgment. Appellants then filed an unopposed motion for entry of final judgment under Maryland Rule 2–

602.[4] On March 17, 2011 the circuit court entered an order directing the clerk to enter final judgment in favor of the State and against appellants. Appellants filed a timely appeal to this Court on April 1, 2011.

### DISCUSSION

Appellants ask us to determine whether the State's inept supervision of Crosby caused Dominick Dixon's death. Despite the tragedy that occurred, that question is not ours to answer. Instead, we must hold that because the State owed no tort duty to appellants, it was entitled to judgment as a matter of law.

### Standard of Review

Summary judgment is proper where the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law. Md. Rule 2–501(f). We review the circuit court's grant of a motion for summary judgment *de novo* and ask whether the trial court was legally correct. *Remsburg v. Montgomery*, 376 Md. 568, 579, 831 A.2d 18 (2003). The material facts here are undisputed. Accordingly, the sole question before us is whether the circuit court was correct as a matter of law that the State owed no tort duty to appellants. *Id.* at 579–80, 831 A.2d 18.

### The State's Duty

Appellants argue that the State had a duty to supervise Crosby so as to prevent Dominick Dixon's death. The State counters that it had no duty "to protect Dominick Dixon or any other member of the general public from harm upon Crosby's release." The circuit court held that no legal duty

---

**4.** Although appellants' complaint named Crosby as a defendant, he did not respond to the summons or the complaint. Because a default judgment order against Crosby had not been fully adjudicated when the circuit court entered its order granting summary judgment in favor of the State, that judgment had to be certified as final under Maryland Rule 2–602(b) before this appeal could lie. Crosby is not a party to this appeal.

ran from the State to appellants, and entered summary judgment in favor of the State. Although we are chagrined at DPP's lackadaisical supervision of Crosby, because the circuit court interpreted Maryland case law correctly on the duty issue, we shall affirm the judgment of the circuit court. We explain.

 The existence of a defendant's duty to protect a plaintiff from injury is vital to a negligence claim, for "there can be no negligence where there is no duty that is due[.]" *Pendleton v. State*, 398 Md. 447, 460, 921 A.2d 196 (2007) (quotation omitted). The general rule is that "there is no duty to control a third person's conduct so as to prevent personal harm to another[.]" *Ashburn v. Anne Arundel County*, 306 Md. 617, 628, 510 A.2d 1078 (1986); Restatement (Second) of Torts § 315 (1965). An exception to that general rule would apply here if a "special relationship" exists: either between the State and Crosby, or between the State and Dominick Dixon. *Ashburn*, 306 Md. at 628, 510 A.2d 1078. This special relationship may arise under either statutory or common law.[5] A statutory duty arises "when the plaintiff is a member of the class of persons the statute was designed to protect and the injury was of the type the statute was designed to prevent." *Remsburg*, 376 Md. at 584, 831 A.2d 18 (quotation and citations omitted). A common law duty arises when a connection between the parties imposes a duty on one party to protect the other. *Id.* at 589–90, 831 A.2d 18. If DPP did not have a duty to control Crosby's actions, then it could not owe appellants a duty to protect Dominick Dixon from harm. *Lamb v. Hopkins*, 303 Md. 236, 253, 492 A.2d 1297 (1985). Thus, we must determine whether the State owed any duty, under either statutory or common law, to control Crosby's conduct while he was on mandatory supervision.

The case of *Lamb v. Hopkins*, 303 Md. 236, 492 A.2d 1297 (1985), is dispositive on that issue. In *Lamb*, a man was on

---

5. A special relationship may also arise by a contractual or other private relationship, *Bobo v. State*, 346 Md. 706, 715, 697 A.2d 1371 (1997). No relationship of that type is alleged here.

supervised probation for armed robbery when he was convicted of a series of offenses, including driving while intoxicated. DPP did not report the offenses to the sentencing court. Later, while driving under the influence of alcohol, the probationer caused an accident that seriously injured the Lambs' five month-old-daughter. *Id.* at 240, 492 A.2d 1297. The Lambs filed suit against DPP, alleging that DPP's negligence in failing to report the probationer's violations to the sentencing court caused their daughter's injuries. The trial court sustained DPP's demurrer on the grounds that DPP owed no duty to the parents. The Court of Appeals granted certiorari "to determine whether a probation officer who fails to report a probationer's violations to the sentencing court owes any duty to an individual injured by the negligence of the probationer." *Id.* at 238, 492 A.2d 1297. In affirming the judgment of the trial court, the Court of Appeals determined that neither statute nor the common law gave rise to a duty on the part of DPP that ran to the Lambs. *Id.* at 253, 492 A.2d 1297. We shall analyze each potential source of a duty here in the context of the principles set forth in *Lamb*.

## A. Common Law Duty

In *Lamb*, as here, "[a]ppellants basically contend[ed] that an individual who controls a person known by him to be dangerous owes a duty to exercise due care to those who may be foreseeably harmed by the failure to exercise this level of care, regardless of whether the foreseeably harmed person is readily identifiable." 303 Md. at 241, 492 A.2d 1297. In rejecting that contention, the *Lamb* Court examined the Restatement (Second) of Torts, §§ 315 and 319:

Section 315 is a special application of the general rule set forth in § 314. Section 314 states that "[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." In turn, § 315 articulates the general rule that:

[t]here is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless

 (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or

 (b) a special relation exists between the actor and the other which gives to the other a right to protection.

This section makes clear that, absent a special relation between the actor and the third person, the actor has no duty to control the conduct of a third person and therefore no liability attaches for the failure to control that person.

* * * * * *

Section 319, entitled "Duty of Those in Charge of Person Having Dangerous Propensities," provides in its entirety: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." The operative words of this section, such as "takes charge" and "control," are obviously vague, and the Restatement makes no formal attempt to define them. The comment to § 319, however, indicates that the rule stated in that section applies to two situations. First, § 319 applies to those situations where the actor has charge of one or more of a class of persons to whom the tendency to act injuriously is normal. Second, § 319 applies to those situations where the actor has charge of a third person who does not belong to such a class but who has a peculiar tendency so to act of which the actor from personal experience or otherwise knows or should know.

Illustrations appended to § 319, which concern the negligent release of an infectious patient from a private hospital for contagious diseases and the escape of a homicidal maniac patient through the negligence of guards employed by a private sanitarium for the insane, provide further guidance regarding the scope of § 319. Because there are degrees of

being "in charge" and having "control," these illustrations are obviously not by way of limitation. These illustrations suggest, however, that § 319 has peculiar application to custodial situations. *See* Prosser and Keeton, *supra*, § 56 & n. 16, at 383 (indicating that the relationships discussed in § 319 "are custodial by nature").

*Id.* at 242–44, 492 A.2d 1297 (footnotes and some citations omitted). The Court adopted § 319 "as the law of this State governing the duty of those in charge of persons having dangerous propensities." *Id.* at 245, 492 A.2d 1297.

Next, the Court applied the principle set forth in § 319. *Id.* at 246–251, 492 A.2d 1297. After surveying a number of cases from other jurisdictions, the Court concluded that the probation officers did not take charge of the probationer within the meaning of § 319 because they did not enter into a custodial relationship:

> Here, the relationship between the probation officers and the probationer was continuing in the sense that the probationer was placed on probation for an extended period of time. However, that does not mean that the officers had taken charge of the probationer. The probationer was essentially free to conduct his day-to-day affairs, and was responsible for reporting certain activities to his probation officers as they arose or as they were scheduled. In addition, unlike in the more typical custodial situations, the officers were evidently not responsible for supervising the probationer on a daily basis. Therefore, because there was no custodial relationship involved in this case, we conclude that the officers did not take charge of the probationer.

*Id.* at 248–49, 492 A.2d 1297. Absent a custodial relationship, the Court concluded, § 319 did not impose on DPP a duty to control the probationer's actions. *Id.* Therefore, the Court found it unnecessary "to determine to whom a § 319 duty is owed." *Id.* at 253, 492 A.2d 1297.

▇ Thus, under § 319, the special relationship that can give rise to a common law duty "has peculiar application to *custodial situations.*" *Id.* at 244, 492 A.2d 1297 (emphasis

added). No such relationship exists between the State and individuals who are granted a conditional release from prison. *Id.* at 248–49, 492 A.2d 1297. That is true whether, as in *Lamb*, the individual was on supervised probation for the remainder of a suspended sentence, or whether, as here, the individual was released from prison on mandatory supervision. *See Patuxent Inst. Bd. of Review v. Hancock*, 329 Md. 556, 574, 620 A.2d 917 (1993) ("Notwithstanding that parole and probation differ in terms of when they occur in the correctional process, each enables criminal offenders to serve at least part of their sentences in the community rather than in prison and requires the offenders to adhere to prescribed conditions in order to retain their conditional freedom."). Because DPP did not have a common law duty to control Crosby's actions, it owed no common law duty to appellants to protect Dominick Dixon from harm inflicted by Crosby. *Lamb*, 303 Md. at 253, 492 A.2d 1297.

## B. Statutory Duty

After determining that DPP had no common law duty to protect the injured Lamb child, the Court considered whether the predecessor to CS § 6–111 imposed that duty.[6] In holding that it did not, the Court explained that DPP's statutory duties ran "from the supervising officer to the court, not from the supervising officer to the general public." *Id.* at 252–53, 492 A.2d 1297. Thus, *Lamb* instructs that DPP's duties under the Correctional Services Article to supervise an individual who has been granted a conditional release from incarceration run to the courts, and do not extend to the public. *Id.*

Rather than identify a particular statute that might convince us otherwise, appellants have taken a "shotgun approach" in their brief. *See e.g., United States v. Amend*, 791 F.2d 1120, 1124 (4th Cir.1986) (noting that most of appellant's "shotgun approach" was "without substantial merit"). They cite at least fifteen statutes, most of which merely grant

6. Then-codified in Md.Code (1957, 1984 Supp.), Art. 41, § 124.

powers to the DOC, MPC, and MPP.[7] Two of the pellets in appellants' shell, however, are close enough to the target that they warrant further discussion.

**■** Section 6–104 of the Correctional Services Article enumerates DPP's general powers and duties. It provides, in relevant part:

(a) *Duties generally.*—Subject to the authority of the Secretary [of Public Safety and Correctional Services] and in addition to any other duties established by law, [DPP]:

(1) shall:

(i) supervise the conduct of parolees;

(ii) supervise an individual under mandatory supervision until the expiration of the individual's maximum term or terms of confinement;

(iii) regularly inform [MPC] of the activities of offenders who are supervised by [DPP];

\* \* \* \* \* \*

(2) may recommend:

(i) that [MPC] modify any condition of parole or mandatory supervision; and

(ii) that [MPC] issue a warrant for the retaking of an offender

Section 7–502 of the Correctional Services Article explains the status of an individual released on mandatory supervision. It provides, in relevant part:

(a) *In general.*—An individual on mandatory supervision remains in legal custody until the expiration of the individual's full term.[8]

---

**7.** The most relevant provisions include CS §§ 6–104, 6–201 *et seq.*, 7–205, 7–206, 7–301, 7–501, 7–502, 7–505.

**8.** The phrase "legal custody" in this section does not implicate the custodial relationship discussed in *Lamb* or in Part A above. Rather, it gives the State the *right* to supervise the individual for the remainder of his full term, and to retake physical custody of the individual if he violates the conditions of his mandatory supervision order. *See Secre-*

(b) *Applicability of laws, rules, regulations, and conditions relating to parolees.*—An individual on mandatory supervision is subject to:

(1) all laws, rules, regulations, and conditions that apply to parolees; and

(2) any special conditions established by [MPC].

Appellants appear to argue that, taken together, CS § 6–104(a)(1)(ii) and CS § 7–502 impose on DPP a duty to supervise individuals for the entire term of their mandatory supervision. On that narrow point, we agree with appellants.

It does not follow, however, that those two sections impose a tort duty on DPP to protect the public from the actions of an individual released on mandatory supervision. The Court of Appeals rejected that argument in *Lamb* when it held that DPP's duties under CS § 6–111 ran to the court, and not to the Lambs. 303 Md. at 252–53, 492 A.2d 1297. Section 6–111 prescribes DPP's duty to supervise a probationer just as CS §§ 6–104 and 7–502 set DPP's duty to supervise an individual on mandatory supervision. Under *Lamb,* DPP owes those duties to the court, and not to appellants. 303 Md. at 252–53, 492 A.2d 1297. We agree with the State that "were the result otherwise, it would escalate the State's responsibility to that of the virtual guarantor of the safety of each and every one of its citizens from illegal and unlawful actions of every parolee or person released from custody under any type or kind of supervision." *See Ashburn,* 306 Md. at 629, 510 A.2d 1078 ("If the police were held to a duty enforceable by each individual member of the public, then every complaint—whether real, imagined, or frivolous would raise the spectre of civil liability for failure to respond.") (citation omitted).

---

tary of *Pub. Safety & Correctional Servs. v. Hutchinson,* 359 Md. 320, 325–27, 753 A.2d 1024 (2000). Thus, CS § 7–502(a) does not establish a custodial relationship necessary to impose on the State a § 319 common law duty to control the actions of a third party. *Lamb,* 303 Md. at 246, 492 A.2d 1297.

CONCLUSION

"Without the showing of a duty, there can be no relief." *McNack v. State*, 398 Md. 378, 399, 920 A.2d 1097 (2007). *Lamb* instructs that the State had no duty, under either statutory or common law, to control Crosby so as to protect others from his actions. Therefore, the State did not owe appellants a duty to protect Dominick Dixon from harm done by Crosby. Because appellants have no valid cause of action for this most regrettable crime, the circuit court did not err in granting summary judgment in favor of the State.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**