*Brendoff v. State*, No. 578, Sept. Term, 2018, Opinion by Leahy, J.

## Statutes > Principles of Statutory Interpretation

A court's primary goal in interpreting statutes is always to discern the legislative purpose. "Every analysis begins with asking whether the relevant statutory scheme evinces a plain meaning. We read the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory If the statutory language is clear and unambiguous, our analysis may end.  However, when the language of the statute is subject to more than one interpretation, it is ambiguous."  *Conaway v. State*, ___ Md. ___, ___, No. 69, Sept. Term, 2018, slip op. at 17 (filed July 11, 2019).  We look to resolve ambiguity by searching for legislative intent in other indicia, including the statute's legislative history and relation to other laws, as well as any relevant case law.  *Watts v. State*, 457 Md. 419, 430 (2018); *Gardner v. State*, 420 Md. 1, 9 (2011).

## Criminal Procedure > Revocation of Probation

A court's determination on the question of whether to revoke probation typically involves two inquiries: "(1) a retrospective factual question whether the probationer has violated a condition of probation; and (2) a discretionary determination by the sentencing authority whether a violation of a condition warrants revocation of probation." *Hammonds v. State*, 436 Md. 22, 31 (2013).  Under the first inquiry, "the hearing judge must find the essential facts comprising a violation of a condition by a preponderance of the evidence."  *State v. Dopkowski*, 325 Md. 671, 677 (1992) (internal quotations omitted).

## Correctional Services > Justice Reinvestment Act > Technical Violations of Probation

The Justice Reinvestment Act of 2016, codified in relevant part as § 6-101(m) of the Correctional Services Article of the Maryland Code, distinguishes between technical and non-technical violations of probation.  Section 6-101(m) defines a technical violation as one that does not involve an arrest or summons issued by a commissioner on a statement of charges filed by a law enforcement officer, a violation of a criminal prohibition other than a minor traffic offense, a violation of a no-contact or stay-away order, or absconding. Maryland Code (1999, 2017 Repl. Vol.), Correctional Services Article ("CS"), 6-101(m).

## Criminal Procedure > Justice Reinvestment Act > Presumptive Incarceration Limits for Technical Violations of Probation

The Justice Reinvestment Act of 2016, codified in relevant part as § 6-223 of the Criminal Procedure Article of the Maryland Code, places presumptive limits on the period of reincarceration courts may impose on probationers who commit technical violations of probation.  Maryland Code (2001, 2008 Repl. Vol., 2017 Supp.), Criminal Procedure

Article ("CP"), § 6-223.  The presumptive incarceration limits may be rebutted, however, if a court, after considering the nature of the probation violation, the circumstances of the crime for which the defendant was convicted, and the defendant's history, finds and states on the record that adhering to the presumptive incarceration limits would "create a risk to public safety, a victim, or a witness."  CP § 6-223(d)(3)(ii).  "Upon making such a finding, a court may impose a period of incarceration that exceeds those contained in the presumptive limits or it may commit the probationer to [the Department] for treatment."  CP § 6-223(d)(3)(iii).

**Criminal Procedure > Justice Reinvestment Act > Non-Technical Violations**

Non-technical violations of probation, such as "absconding," still remain subject to the court's power to revoke probation and impose sentences that might originally have been imposed, without adherence to the presumptive incarceration limits for technical violations.  Maryland Code (1999, 2017 Repl. Vol.), Correctional Services Article ("CS"), 6-101(m); CP § 6-223.

**Correctional Services > Justice Reinvestment Act > Non-Technical Violations of Probation > Absconding**

The Justice Reinvestment Act of 2016, codified in relevant part as § 6-101(b) of the Correctional Services Article of the Maryland Code, defines the term "absconding" as "willfully evading supervision," though it "does not include missing a single appointment with a supervising authority."  Maryland Code (1999, 2017 Repl. Vol.), Correctional Services Article ("CS"), 6-101(b)(1)-(2).

**Correctional Services > Justice Reinvestment Act > Non-Technical Violations of Probation > Commitment for Treatment > Absconding**

When a prisoner is placed on supervised probation upon admission into a drug and alcohol treatment facility pursuant to an order issued under Maryland Code (1982, 2015 Repl. Vol., 2017 Supp.), Health General Article ("HG"), § 8-507, the Division of Parole and Probation, which includes the assigned probation agent, is the probationer's "supervising authority" for purposes of ascertaining whether the probationer has absconded within the meaning of Maryland Code (1999, 2017 Repl. Vol.), Correctional Services Article ("CS"), 6-101(b).

**Correctional Services > Justice Reinvestment Act > Non-Technical Violations of Probation > Commitment for Treatment > Absconding**

When there is an allegation of a non-technical violation of probation by "absconding," then the first inquiry in the court's determination, *Hammonds v. State*, 436 Md. 22, 31 (2013), is an assessment of whether the probationer willfully evaded his or her supervising authority.

Circuit Court for Anne Arundel County
Case No. 02K09002331, 02K09002332, 02K09002333

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 578

September Term, 2018

---

RICHARD BRENDOFF

v.

STATE OF MARYLAND

---

Fader, C.J.,
Leahy,
Friedman,

JJ.

---

Opinion by Leahy, J.

---

Filed: August 1, 2019

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Moving prisoners from prison beds to treatment beds was one of the galvanizing objectives of Maryland's Justice Reinvestment Act ( "JRA").[1] 2016 Md. Laws, ch. 515.[2] In keeping with this objective, the JRA established presumptive incarceration limits for technical violations of probation. Maryland Code (2001, 2008 Repl. Vol., 2017 Supp.),[3] Criminal Procedure Article ("CP"), § 6-223. However, non-technical violations of probation, such as "absconding," still remain subject to the court's power to revoke probation and impose sentences that might originally have been imposed, without adherence to the presumptive incarceration limits for technical violations. Maryland Code (1999, 2017 Repl. Vol.), Correctional Services Article ("CS"), 6-101(m); CP § 6-223. Absconding is defined as "willfully evading supervision," though it "does not include missing a single appointment with a supervising authority." CS § 6-101(b)(1)-(2).

Appellant, Richard Brendoff, entered guilty pleas on March 16, 2010, for theft, second-degree burglary, and attempted second-degree burglary in three separate cases in

---

[1] During a legislative oversight hearing in January of 2017, Maryland Public Defender Paul B. DeWolfe depicted the underpinning of the Justice Reinvestment Act as: "a shift in philosophy from the jail bed to the treatment bed." Steve Lash, *Justice Reinvestment Faces Implementation Challenges, Lawmakers Told*, THE DAILY RECORD (Jan. 19, 2017), https://perma.cc/J2HJ-FM9N.

[2] As explained later in this opinion, the JRA enacted comprehensive reforms by adding and amending numerous statutes, including, as pertinent to this appeal, provisions of the Correctional Services and Criminal Procedure Articles of the Maryland Code.

[3] We cite to the version of the statute in effect at the time of the violation of probation hearing in this case, which occurred on November 20 and 22, 2017. The relevant provisions of the JRA became effective on October 1, 2017, and section 6-223 was subsequently amended again in 2018 without substantive change. *See* Maryland Code (2001, 2018 Repl. Vol.), Criminal Procedure Article ("CP"), § 6-223.

the Circuit Court for Anne Arundel County. While serving his sentences, Brendoff asked the court to commit him to a drug and alcohol treatment program pursuant to Maryland Code (1982, 2015 Repl. Vol., 2017 Supp.), Health General Article ("HG"), § 8-507. On August 23, 2016, the court granted Brendoff's motion and committed him to the Department of Health[4] ("the Department") for residential drug treatment at a facility to be determined by the Department. The court placed Brendoff on supervised probation and, as conditions of his probation, he was to complete drug treatment generally; the residential treatment program specifically; plus, any after care.

Brendoff was admitted into the Jude House Residential Substance Abuse Treatment Program ("Jude House"), which he left prior to being discharged. On December 20, 2016, the State charged Brendoff with violating a condition of his probation. While the violation of probation ("VOP") hearing was pending, Brendoff contacted his probation agent and entered New Life Addiction Counseling Service ("New Life"), a different out-patient treatment center. Unfortunately, he incurred additional VOP charges on February 23, 2017, after missing six required treatment sessions. At the VOP hearing, the circuit court found that Brendoff had committed non-technical violations of the conditions of his probation based on the allegation that he absconded *from the treatment facilities*. The court revoked Brendoff's probation and ordered him to serve 10 years of his previously

---

[4] During the 2017 session, the Maryland General Assembly changed the name of the Department of Health and Mental Hygiene to the Department of Health. 2017 Md. Laws, ch. 214.

suspended sentences.    We granted Brendoff leave to appeal[5] the circuit court's

determination that he committed a non-technical violation of his probation by

"absconding."[6]

We hold that when a prisoner is placed on supervised probation upon admission into

a drug and alcohol treatment facility pursuant to an order issued under HG § 8-507, the

Division of Parole and Probation ("DPP"), which includes the assigned probation agent, is

the probationer's "supervising authority" for purposes of ascertaining whether the

probationer has absconded within the meaning of CS § 6-101(b).  Consequently, the court

erred in this case by implicitly treating the treatment facilities as the supervising authorities

when the court found that Brendoff committed a non-technical violation of his probation

by walking away from Jude House and missing six required appointments at New Life.

---

[5] *See* Maryland Rule 8-204 and Maryland Code (1973, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 12-302(g).  Recently, in a consolidated opinion, the Court of Appeals decided two cases that involved petitioners who had their probation revoked for committing technical violations and who received sentences exceeding the JRA's presumptive sentencing limits for technical violations based on findings that they were threats to public safety. *Conaway v. State*, ___ Md. ___, ___, No. 69, Sept. Term, 2018, slip op. at 3-4, 8-9 (filed July 11, 2019).  The petitioners asserted that probationers in their position are granted a right of direct appeal under CJP § 12-302(g) and the appealability provisions of the JRA. *Id*. at 16.  The Court held, however, that CJP § 12-302(g) unambiguously requires a probationer to seek review of a revocation of probation and sentence through an application for leave to appeal. *Id*. at 18, 22.  The Court also held that the appealability provisions of the JRA unambiguously require a probationer to seek review of the findings of a technical violation and the resultant period of incarceration exceeding the JRA's presumptive incarceration limits by means of an application for leave to appeal. *Id*. at 26.

[6] On appeal, Brendoff presents one question for our review: "Did the circuit court err in this case in determining that [Brendoff] absconded where he did not satisfy a condition of his probation that he complete a residential drug treatment program but he remained under the supervision of the Division of Parole and Probation?"

Accordingly, we remand this case to the circuit court to determine whether Brendoff absconded in violation of his probation by "willfully evading [the] supervision" of his probation agent.  CS § 6-101(b)(1)-(2).

## BACKGROUND

On October 23, 2009, a grand jury in the Circuit Court for Anne Arundel County issued three separate indictments for Brendoff.  The first indictment, which arose out of offenses committed on or about October 11, 2009, charged him with second-degree burglary, theft of $10,000 to under $100,000,[7] malicious destruction of property, and conspiracy to commit second-degree burglary.  The second indictment, which arose out of offenses committed on or about September 28, 2009, charged Brendoff with second-degree burglary, theft of $500 or more, malicious destruction of property, and conspiracy to commit second-degree burglary.  The third and final indictment, which arose out of offenses committed on or about September 29, 2009, charged him with attempted second-degree burglary, malicious destruction of property, and conspiracy to commit second-degree burglary.

Brendoff waived his right to a jury trial and pleaded guilty on March 16, 2010, to theft over $1,000 to under $10,000 in the first case, second-degree burglary in the second case, and attempted burglary in the second degree in the third case.[8]  At the sentencing hearing on April 16, 2010, the circuit court imposed concurrent 15-year sentences with all

_____

[7] The State later amended this count to theft over $1,000 to under $10,000.

[8] The State *nolle prossed* the remaining counts in all three cases.

but eight years suspended for the burglary offenses. The court also imposed a suspended 10-year sentence for the theft offense to run consecutive to the two burglary sentences. For all three offenses, the court placed Brendoff on five years' supervised probation upon physical release from incarceration. The court's order ("2010 Probation Order") imposed certain standard conditions of probation and, as relevant to this appeal, five special conditions of probation:

- Submit to and pay for random urinalysis as directed by Supervising Agent.

- Submit to, successfully complete, and pay required costs for [drug evaluation, testing, and treatment.]

- Attend and successfully complete [drug treatment and education program].

- Totally abstain from alcohol, illegal substances, and abusive use of a prescription drug.

- Have no contact with victims or witnesses.

## HG § 8-507 Commitment

While serving his burglary sentences, Brendoff requested that the court commit him to the Department for drug and alcohol treatment pursuant to HG §§ 8-505 through 8-507.[9]

---

[9] From 2012 to 2014, Brendoff wrote several letters to the court requesting commitment to a drug and alcohol program, which the court treated as motions for an HG § 8-505 evaluation and an HG § 8-507 commitment. In denying Brendoff's initial motions in 2012 and 2013, the circuit court noted that it would reconsider the motions after April 1, 2014. According to one of Brendoff's letters, the sentencing judge wanted Brendoff to serve half of his sentence before considering him for § 8-505 evaluations and § 8-507 placement.

On June 4, 2014, Brendoff filed, *pro se*, a form petition for civil commitment to the Department pursuant to HG §§ 8-505 and 8-507. On June 30, 2014, the circuit court ordered Brendoff for in-custody evaluation for drug and alcohol treatment pursuant to HG

5

On July 5, 2016, the Department issued an evaluation report recommending Brendoff for § 8-507 placement. The circuit court held a hearing on August 23, 2016, and issued an § 8-507 order committing Brendoff to the Department for "inpatient residential substance abuse treatment at a facility to be determined by [the Department], beginning upon bed availability and ending upon completion of or termination from treatment[.]" The order provided, in relevant part:

> That *supervision* of the Defendant shall be provided by:
> *The Division of Parole & Probation* in that the sentence of the Defendant shall be suspended and the Defendant shall be placed on probation effective upon the acceptance and transporting of the Defendant to the designated DHMH Facility.
>
> * * *
>
> IT IS FURTHER ORDERED that in the event the Defendant leaves the treatment facility without authorization or is terminated from the facility or any after care program for any reason, the Division of Parole and Probation and the State shall be notified as soon as reasonably possible.

(Emphasis added).

The balance of Brendoff's sentences for the burglary offenses was suspended upon admission to treatment. The "Probation/Supervision Order" ("2016 Probation Order") stated that Brendoff would be supervised by "Parole and Probation" and that the length of his probationary period was five years. The 2016 Probation Order imposed general conditions and the following special conditions on his probation:

- Submit to and pay for random urinalysis as directed by Supervising Agent.

---

§ 8-505. Despite the Department's evaluation that Brendoff was amenable to substance abuse treatment, on August 7, 2014, the court held the request *sub curia* for reasons unapparent from the record on appeal.

6

- Submit to, successfully complete, and pay required costs for [alcohol and drug evaluation, testing, treatment, education], as directed by your supervising agent.

- Totally abstain from alcohol, illegal substances, and abusive use of any prescription drug.

- Successfully complete residential program and any after care.

The order also included a Consent to Treatment form, signed by Brendoff, which stated:

> I further agree to enter and complete any residential or out-patient program recommended and arranged by the Department of Health and Mental Hygiene and to comply with the terms of any Probation Order in this case and any after-care plan developed for me. I have been informed that if I fail to comply with the conditions of my probation, I will face imposition of the sentence which was suspended.

### The Violations of Probation

Pursuant to the commitment order, Brendoff was admitted on November 10, 2016, into Jude House for 120 days of treatment. On December 9, 2016, however, Brendoff left Jude House prior to being discharged. Brendoff's probation agent submitted a report the next week informing the court of Brendoff's departure from Jude House.

On or around December 16, 2016, Brendoff was admitted into New Life, an intensive out-patient treatment center. The State nevertheless requested a warrant and filed a statement of charges on December 20, 2016, alleging that Brendoff violated a condition of the 2016 Probation Order by leaving Jude House prior to being discharged. Eight days later, the court issued a summons to Brendoff for an initial appearance on January 30, 2017. Brendoff complied, and at his initial appearance, the circuit court notified Brendoff that his VOP hearing was scheduled for March 6, 2017.

While the VOP hearing was pending, Brendoff was arrested and charged with

7

multiple crimes, including attempted murder and armed robbery in connection with a drug deal that went bad on February 20, 2017. Brendoff's probation agent informed the court on February 23, 2017, of these additional violations of the conditions of his probation.[10] His probation agent further reported that on February 15, 2017, New Life sent her a "status report" indicating that "Brendoff had missed six required sessions and that his attitude and appearance were an indication of relapse potential." Consequently, the State amended its statement of charges to include additional allegations that Brendoff also violated the conditions of his probation relating to, *inter alia*, drug treatment by leaving Jude House prior to being discharged and for missing "six required sessions" at New Life. Accordingly, on February 27, 2017, the circuit court issued a no-bond bench warrant for Brendoff for the VOPs.[11]

### Violation of Probation Hearing

On November 20 and 22, 2017, the circuit court held a hearing on the charged VOPs. The State called three witnesses: Felicia Powers, Brendoff's probation agent at the time of trial; Cheyenne Potter, Brendoff's co-defendant in the case for attempted murder alleged to have occurred on February 20, 2017; and Detective Franklin Bilbrey, the lead detective

---

[10] On the basis of this information, the State charged Brendoff with violating the condition that he obey all laws, and the condition that he get permission from the court before owning, possessing, using, or having under his control any dangerous weapon or firearm.

[11] On March 2, 2017, the probation agent reported that Brendoff violated yet another condition of probation. The report stated that on February 24, 2017, Brendoff received a citation in Anne Arundel County for theft less than $1,000. The statement of charges was thereafter amended to include this allegation under the charged violation of the condition that he obey all laws.

in that case. Ms. Potter and Det. Bilbrey testified about the February 20 case that formed the basis for certain VOP charges that are not the subject of the instant appeal.

Most pertinent to this appeal is the testimony of Agent Powers. She testified that she became Brendoff's probation agent in June 2017. According to Agent Powers, there were two agents on the case before her: Agent Thomas and Agent Sims. Agent Thomas was Brendoff's probation agent at the time he entered treatment at Jude House. Then, when Brendoff later entered treatment at New Life, Agent Sims became his probation agent.

Agent Powers inherited Agent Thomas's case file on Brendoff. Agent Powers confirmed that Agent Thomas reported the first VOP to the court, indicating that Brendoff had left the Jude House on December 9, 2016. She testified that, based on that VOP report, the circuit court issued a summons for Brendoff during the time he was meeting with Agent Sims and attending treatment at New Life, which he had entered on December 19, 2016. According to the discharge summary from New Life, which the defense moved into evidence, Brendoff was discharged on February 22, 2017, due to attendance issues.[12]

Agent Powers testified further about her personal knowledge of Brendoff's treatment at Jude House and New Life. She related that after taking over as the supervisor

_____

[12] The New Life discharge summary indicated an admission date of December 16, 2016. Defense counsel also introduced, and the court received into evidence, a progress report from the Jude House. The report, which covered Brendoff's progress from November 10 through November 30, 2016, stated that Brendoff was in the "action stage" of treatment, was committed to changing, and was working on coping skills. The record indicates, however, that neither party entered the discharge summary from Jude House into evidence.

on the case, she never met with Brendoff in person but spoke with him over the phone once, when he called her on October 25, 2017. During that phone conversation, she explained, Brendoff told her that "he had walked away from his 8-507 program" at Jude House because he took opiates following a back injury and relapsed.

The State averred in closing that the VOP charge rested on two issues: "the treatment allegations and the failure to obey all laws[.]" With respect to the "treatment allegations," the State argued that Agent Powers "testified that [Brendoff] was released to Jude [House] on an 8-507 and he absconded from treatment." Brendoff's counsel retorted that, although Brendoff left Jude House, the events that took place after he left showed that he had not absconded. Specifically, counsel argued that Brendoff was still reporting to his probation agent after leaving Jude House, as evidenced by the fact that he entered treatment at New Life "within a week of walking out of Jude House." Counsel highlighted, additionally, that Brendoff appeared for his arraignment following his exit from Jude House.

With regard to the allegations that Brendoff missed six treatments at New Life, his counsel acknowledged that "from [New Life's] discharge summary, . . . there certainly was some evidence of relapse and Brendoff had stopped going to classes or was not going consistently." Counsel argued, however, that Brendoff "was not discharged from New Life unsuccessfully until he was arrested and, obviously, could no longer [attend]." Accordingly, defense counsel asserted that Brendoff did not abscond and, therefore, did not violate his conditions of probation relating to drug treatment.

The case was continued until November 22, 2017, at which time the court issued its findings and determined whether to reincarcerate Brendoff. The court began by stating

10

that, based on all of the evidence, it found that "this is not a technical violation because one of [the] allegations is that Brendoff absconded so it is not a technical violation." Regarding the allegation that Brendoff absconded from drug treatment, the court found that he violated the conditions of his probation relating to drug treatment because it was "undisputed that [] Brendoff walked away from 8-507 treatment at the Jude House on December 9, 2016 without being discharged" and that he also missed the six required sessions at New Life.[13]

The court found that Brendoff was not doing well in either of his drug treatment programs and that he was not amenable to treatment. The court revoked his probation and ordered him to serve a total sentence of 10 years at the Department of Corrections: (1) three of the 10 years that were suspended for the theft offense; and (2) seven of the eight years that were suspended for the attempted robbery offense.[14]

Pursuant to Maryland Rule 8-204 and Maryland Code (1973, 2013 Repl. Vol.), Courts and Judicial Proceedings Article ("CJP"), § 12-302(g), Brendoff filed an application

---

[13] The circuit court did not find that Brendoff violated the other conditions of his probation. With regard to the condition that Brendoff obey all laws, the court decided that there was no violation because the State argued at the VOP hearing that Brendoff violated certain laws that were not specifically alleged in the statement of charges, thereby raising due process concerns. Next, the court could not find that there was a violation of the condition that Brendoff receive permission from the court before owning, possessing, using, or having under his control any dangerous weapon or firearm, because it "c[ould] not say that it [wa]s more likely that [] Brendoff possessed a firearm or that the [victim possessed] the firearm so [it] just c[ould not] find that the State met its burden on that."

[14] The court also ordered Brendoff to serve seven of the eight years that were suspended for the robbery offense, which was to run concurrently with the sentence for attempted robbery.

11

for leave to appeal in all three cases to this Court on December 21, 2017, which we granted on May 31, 2018, and consolidated for appeal.

## DISCUSSION

Before this Court, Brendoff contends that the circuit court erred in concluding that his failure to complete drug treatment equated to "absconding" as defined by CS § 6-101(b) and was, therefore, a non-technical violation of probation. His principal contention is that any such violation of his conditions of probation did not amount to absconding because there was no evidence that he "failed to report to his probation agent or failed to keep his agent apprised of his whereabouts."[15] Brendoff posits that, under the definition of "absconding" in CS § 6-101(b), "a violation of a condition of probation would involve absconding if the probationer failed to report to his or her probation agent or failed to notify the agent of a change of address." According to Brendoff, his probation agent was "continuously aware of his whereabouts."

In response, the State argues that the evidence was sufficient for the circuit court to conclude that Brendoff willfully evaded supervision. The State asserts that Brendoff made two concessions before the circuit court: (1) that he "walked out" of Jude House and (2) that he missed six sessions at New Life. The State argues that Brendoff was under the

---

[15] Brendoff also argues briefly that the State failed to present any evidence that he violated the conditions of his probation in the manners alleged in the statement of charges. Specifically, he argues, the State failed to present any evidence showing that he missed treatment sessions at New Life. According to Brendoff, Ms. Powers testified only about his departure from Jude House and did not testify to any matters regarding Brendoff's treatment at New Life. Because our holding today rests on the circuit court's interpretation of the law, we need not address this argument.

12

supervision of the treatment facility staff while at Jude House and New Life. Additionally, the State points out that there is no evidence that Brendoff told his probation agent that he left or where he was going when he stopped treatment at both facilities.

Although we ordinarily review a circuit court's determination that a defendant violated his or her conditions of probation for an abuse of discretion, *Hammonds v. State*, 436 Md. 22, 37 (2013), "[t]he interpretation of a statute is a question of law that this Court reviews *de novo*." *Brown v. State*, 454 Md. 546, 550 (2017) (citation omitted). "These two seemingly disparate standards of review are sometimes reconciled with the observation that it is an abuse of discretion for a court to base a decision on an incorrect legal standard." *Rodriguez v. Cooper*, 458 Md. 425, 437 n.9 (2018).

## I.

### Statutory Interpretation

The parties advance differing interpretations of CS § 6-101(b), which defines "absconding" as "willfully evading supervision" but "does not include missing a single appointment with a supervising authority." Brendoff contends that, as a probationer, he is not "absconding" unless he willfully evades the supervision of his probation agent. To the contrary, the State argues that for purposes of "absconding" under the statute, the supervising authorities comprise not only Brendoff's probation agent but also his 8-507 treatment facilities (Jude House and New Life). Therefore, the State reasons, the circuit court found correctly that Brendoff "absconded" from the treatment facilities.

This case compels us to examine the meaning of "absconding" under CS § 6-101(b) in tandem with the meaning of "supervision" and "supervising authority." Our analysis is

13

guided by "the often-cited" principles of statutory construction:

>Our primary goal is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision, be it statutory, constitutional, or part of the [Maryland] Rules. There are a host of principles in aid of divining legislative intent.
>Every analysis begins with asking whether the relevant statutory scheme evinces a plain meaning. We read the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory. If the statutory language is clear and unambiguous, our analysis may end. However, when the language of the statute is subject to more than one interpretation, it is ambiguous. . . . In parsing whether plain meaning or ambiguity is the case, we view the relevant statutory scheme as a whole, rather than seizing a single provision.

*Conaway v. State*, ___ Md. ___, ___, No. 69, Sept. Term, 2018, slip op. at 17 (filed July 11, 2019) (alterations and internal citations omitted). We seek to harmonize statutes on the same subject and read them so as "to avoid rendering either statute or any portion, meaningless, surplusage, superfluous or nugatory." *Mayor & Town Council of Oakland v. Mayor & Town Council of Mountain Lake Park*, 392 Md. 301, 316-17 (2006) (internal citations and quotations omitted). "Even if the plain meaning is clear and unambiguous, we often look to legislative intent and purpose to determine if they ratify our analysis and interpretation of a statute." *Hammonds*, 436 Md. at 44.

### A. Plain Language of the Statute

We begin our analysis by examining the statute's plain language. Section 6-101(b) defines the term "absconding:"

(b) *Absconding.* — (1) "Absconding" means willfully evading supervision.
(2) "Absconding" does not include missing a single appointment with a supervising authority.

Subsection (m) of the same provision clarifies that "absconding" is not a "technical

violation" of probation, parole, or mandatory supervision:

> (m) *Technical violation.*—"Technical violation" means a violation of a condition of probation, parole, or mandatory supervision that does *not* involve:
> > (1) an arrest or a summons issued by a commissioner on a statement of charges filed by a law enforcement officer;
> > (2) a violation of a criminal prohibition other than a minor traffic offense;
> > (3) a violation of a no-contact or stay-away order; or
> > (4) *absconding*.

CS § 6-101(m) (emphasis added).

The significance of CS §§ 6-101(b) and (m) is manifest under the statute governing probation revocations, CP § 6-223. Section 6-223 "limit[s] [] the duration of incarceration that may be imposed for a 'technical' violation of probation[,]" parole, or mandatory supervision. *Conaway*, slip op. at 14. The statute provides, in relevant part:

> (d) *Options after hearing.* — If, at the hearing, a circuit court or the District Court finds that the probationer or defendant has violated a condition of probation, the court may:
> > (1) revoke the probation granted or the suspension of sentence; and
> > (2)(i) subject to subsection (3) of this section, for *a technical violation*, impose a period of incarceration of:
> > > 1. not more than 15 days for a first technical violation;
> > > 2. not more than 30 days for a second technical violation; and
> > > 3. not more than 45 days for a third technical violation; and
> > (ii) for a fourth or subsequent *technical violation* or a violation that is not a technical violation, impose any sentence that might have originally been imposed for the crime of which the probationer or defendant was convicted or pleaded nolo contendere.

CP § 6-223(d).[16] Subsection (d)(3) creates "a rebuttable presumption that the limits on the

---

[16] As mentioned *supra*, note 3, CP § 6-223 was amended in 2018, without substantive change. The amendment re-designated former subsections (d)(3)(i) through (d)(3)(iv) as subsections (e)(1) through (e)(4).

period of incarceration that may be imposed for a technical violation established in paragraph (2) of this subsection are applicable" to probationers who commit technical violations of their probation. CP § 6-223(d)(3)(i)-(ii). The presumptive incarceration limits may be rebutted, however, if a court, after considering the nature of the probation violation, the circumstances of the crime for which the defendant was convicted, and the defendant's history, finds and states on the record that adhering to the presumptive incarceration limits would "create a risk to public safety, a victim, or a witness." CP § 6-223(d)(3)(ii). "Upon making such a finding, a court may impose a period of incarceration that exceeds those contained in the presumptive limits or it may commit the probationer to [the Department] for treatment." *Conaway*, slip op. at 15; CP § 6-223(d)(3)(iii).

Although these statutory provisions clarify the implications of "absconding" in terms of the consequences for a violation of probation, the plain language of CS § 6-101(b) does not identify the supervising authority or define what is meant by the term "supervision." Recognizing this ambiguity, we look to resolve it by

> searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose and relative rationality and legal effect of various competing constructions.
>     In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical or incompatible with common sense.

*Gardner v. State*, 420 Md. 1, 9 (2011). We turn now to discerning the General Assembly's intent in enacting CS § 6-101 by examining the statute's legislative history and relation to other laws, as well as any relevant case law. *Id.* at 9; *Watts v. State*, 457 Md. 419, 430 (2018).

16

## B. Legislative Scheme and Relation to Other Laws

### 1. HG § 8-507

Brendoff was placed on supervised probation pursuant to a commitment order under HG § 8-507. That statute provides the strongest insight to what "supervision" means in these circumstances. Section 8-507 governs the commitment of defendants to the Department for treatment "as a condition of release, after conviction, or at any other time the defendant voluntarily agrees to participate in treatment[.]" HG § 8-507(a). A defendant released on probation and committed to § 8-507 treatment based upon a finding of an alcohol or drug dependency must be placed under the supervision of the DPP. Specifically, § 8-507(f) provides:

> (f) *Supervision of defendant.* — For a defendant committed for treatment under this section, a court **shall order supervision of the defendant**:
> (1) By an appropriate pretrial release agency, if the defendant is released pending trial;
> (2) **By the Division of Parole and Probation** under appropriate conditions in accordance with §§ 6-219 through 6-225 of the Criminal Procedure Article and Maryland Rule 4-345, **if the defendant is released on probation**; or
> (3) By the Department, if the defendant remains in the custody of a local correctional facility.

(Emphasis added). Section 8-507(f) existed prior to the JRA's enactment, and "we presume that the General Assembly acted with full knowledge of prior legislation and intended statutes affecting the same subject matter to blend into a consistent and harmonious body of law." *Mayor & Town Council of Oakland*, 392 Md. at 316-17 (internal quotations omitted). Tellingly, the JRA amended portions of HG § 8-507, but retained the

17

language in § 8-507(f) that tasked the DPP with supervision of defendants released on probation.[17] Reading CS § 6-101(b) and HG § 8-507(f) harmoniously, we conclude that when a probationer is committed to a treatment facility pursuant to an HG § 8-507 order, it is the DPP—not the treatment facility—that serves as the "supervising authority" responsible for the probationer's "supervision."

## 2. Title 6 of the Correctional Services Article

Other provisions of Title 6 of the Correctional Services Article reinforce our interpretation of CS § 6-101(b). *Cf. Conaway*, slip op. at 24-25 (finding support for the interpretation that the appealability provisions of the JRA are unambiguous by looking at other provisions within the same title). For instance, Section 6-115, which governs the payment of "supervision fees" by "supervisees," defines a "supervisee" as "a person that the court places under the *supervision of the Division* [*of Probation and Parole*]." CS § 6-115(a)(3) (emphasis added). Section 6-121, which provides graduated sanctions for technical violations of conditions of supervision, states that "[t]his section shall apply to all individuals under the *supervision of the Division* [*of Probation and Parole*]." CS § 6-121(a) (emphasis added). Significantly, Section 6-111 imposes upon the DPP a statutory duty to "*supervise* an individual based on the probation order[.]" CS § 6-111(3) (emphasis

---

[17] With passage of the JRA, the General Assembly amended HG § 8-507(e) to require the Department to provide "immediate treatment of a defendant," unless exigent circumstances justify delaying treatment for longer than 30 days. 2016 Md. Laws, ch. 515, §2. The amendment also authorized a court to compel the Department to appear in court to provide an explanation for the lack of placement when a defendant, who has been committed, "is not placed in treatment within 21 days of the order." 2016 Md. Laws, ch. 515, §2.

added).   These sections consistently employ the term "supervision" in reference to the DPP, supporting our conclusion that "supervision" in CS § 6-101(b) refers to the obligation of the DPP.

## C. Legislative History

### 1. The Justice Reinvestment Act

Now we consider the legislative history of the JRA and CS § 6-101 to determine if it ratifies our analysis and interpretation of CS § 6-101(b).   In the early 1990s, crime rates were skyrocketing across the United States and the nation's criminal justice landscape began to reflect a "tough on crime" policy approach.   Maryland took part in this national trend and, as a result, the state's incarcerated population and spending on sentencing and corrections soared at great cost.[18]   As the Court of Appeals recently explained, "[t]he primary goal of the JRA was to reduce selectively Maryland's prison population and use the resultant monetary savings to provide treatment to offenders before, during, and after incarceration."   *Conaway*, slip op. at 14 (applying the principles of statutory interpretation to CP § 6-223(e)(4), JRA's appealability provision, as currently codified); *see also* S.B. 1005, 2016 Leg. Reg. Sess. (Md. 2016), Revised Fiscal and Policy Note, at 20-21, https://perma.cc/3NYZ-4MVJ.   In 2015, the General Assembly established the Justice Reinvestment Coordinating Council ("JRCC") in the Governor's Office of Crime Control and Prevention in order to, among other things, "develop a statewide policy framework of

---

[18] Bridget Lowrie, Esq., *Stop Asking Which Came First, The Jail or the Criminal-Start Reinvesting in Justice in Maryland*, 47 U. Bal. F. 99, 103-107 (2017); *see also Maryland Justice Reinvestment Act: One Year Later*, JUSTICE POLICY INSTITUTE (Oct. 31, 2018), https://perma.cc/LBE3-RD67.

sentencing and corrections policies to further reduce the State's incarcerated population, reduce spending on corrections, and reinvest in strategies to increase public safety and reduce recidivism[.]" *Id*. at 20.

After reviewing data and research on effective corrections and sentencing policies, the JRCC ultimately developed 19 policy recommendations for legislative consideration. These recommendations were "intended to focus prison resources on serious and violent offenders, strengthen community supervision efforts, improve and enhance release and reentry practices, support local corrections systems, and ensure oversight and accountability." Justice Reinvestment Coordinating Council, *Final Report*, S.B. 602, 2015 Leg., Reg. Sess. at 1, 21 (Md. 2015) [hereinafter *JRCC Final Report*]. The General Assembly largely adopted the JRCC's recommendations, enacting the JRA by passing Senate Bill 1005 ("S.B. 1005"), which Governor Larry Hogan signed into law on May 19, 2016.

The JRA went into effect on October 1, 2017.[19] As enacted, the defining features

---

[19] We recognize that it was not until after Brendoff committed the offenses underlying his charges for violating probation that the amended versions of CS § 6-101 and CP § 6-223 went into effect on October 1, 2017. The Court of Appeals in *Waker v. State*, 431 Md. 1 (2013) instructed that when a new law enacted after the underlying offense but before the trial and sentencing is more favorable to the defendant, the trial court applies the new law in effect at the time of trial and sentencing. *Id*. at 10-12. The Court explained that under these circumstances, neither the general savings clause nor the *ex post facto* prohibition contained in Article 17 of the Maryland Declaration of Rights are applicable. *Id*. at 12 & 12 n.3.

As amended under the JRA, CS § 6-101 and CP § 6-223 are more favorable to Brendoff because they provide sentencing limits for technical violations of probation in furtherance of the JRA's aim of reducing the state's prison population. S.B. 1005, 2016 Leg., Reg. Sess. (Md. 2016), Revised Fiscal and Policy Note, at 20-21, https://perma.cc/3NYZ-4MVJ. The VOP hearing in the underlying case occurred after the

of the JRA can be summarized as follows:

> First, the JRA reduced the maximum penalties for convictions on drug distribution charges. Second, it repealed mandatory minimum sentences for nonviolent drug crimes. Finally, . . . it limited presumptively the duration of incarceration that may be imposed for a 'technical' violation of probation.

*Conaway*, slip op. at 14.

## 2. CS § 6-101

In 1999, the General Assembly passed House Bill 11 ("H.B. 11"). The bill's purpose was, among other things, to "add[] a new article to the Annotated Code of Maryland, to be designated and known as the 'Correctional Services Article,' to revise, restate, and recodify the laws of the State and local correctional systems, including laws that relate to . . . the Division of Parole and Probation[.]" 1999 Md. Laws ch. 54. Section 6-101, as it was enacted under H.B.11, did not include the term "absconding." That term was first introduced in the statute in 2016 with passage of the JRA. 2016 Md. Laws ch. 515. As discussed, the JRA adopted the policy recommendations contained in the JRCC's Final Report, which rested ultimately on three major findings. First, the JRCC reported that, although the number of prison admissions in Maryland had generally declined over the past decade, "[a]lmost 60 percent of all prison admissions represent failures of probation, parole, or mandatory release supervision, often for technical violations rather than a new criminal conviction." *JRCC Final Report* at 19. The JRCC identified "missing a treatment appointment or failing a drug test" as examples of technical violations. *Id.*

---

JRA went into effect. Accordingly, the trial court was correct to apply the new probation revocation sentencing law—the relevant provisions of the Justice Reinvestment Act.

Next, the JRCC found that "increased length of stay in prison ha[d] been a consistent driver of the prison population," with "[p]robation technical violators serv[ing] an average of 31 months longer than many offenders sentenced directly to prison." *Id*. at 1, 8-9, 12. Finally, the JRCC found that Maryland's supervision resources and practices did not focus on serious and violent offenders and that the DPP did not have a standardized framework for responding to technical violations of conditions of probation, parole or mandatory supervised release. *Id*. at 1, 10-11, 19.

Accordingly, for policies regarding probation and parole, the JRCC recommended that the General Assembly establish a definition for the term "technical violation" as "any violation that does not include an arrest, a conviction, a violation of a no contact order, or failure to participate in a required domestic abuse intervention program." *Id*. at 19. For such technical violations, the JRCC recommended that the DPP respond using a graduated system of non-custodial sanctions before pursuing the formal revocation process. *Id*. Additionally, the JRCC recommended establishing graduated incarceration periods for "offenders revoked for technical violations up to 15, up to 30, and up to 45 days of the first, second, and third revocation, respectively. The judge or Parole Commission will be able to impose up to the remainder of the full sentence for any subsequent revocations." *Id*. at 19.

These recommendations were largely enacted in S.B. 1005, while its counter-part, House Bill 1312, died in committee. In the final version of S.B. 1005, the General

Assembly defined the term "technical violation," which was codified under CS § 6-101,[20]

and enacted graduated sanctions and incarceration schemes for technical violations of

conditions of probation, which were codified under CP §§ 6-121 and 6-223, respectively.

Accordingly, there is a "rebuttable presumption" that no more than 15 days of incarceration

should be imposed for the first technical violation of probation.

We glean from this legislative history, together with the foregoing analysis of the

statutory scheme, that the General Assembly intended this newly created progressive

discipline scheme for *technical* violations to apply in circumstances such as the failure of

a probationer to complete drug treatment, especially when the probationer makes his or her

whereabouts known to the probation agent and renders responsive to that agent. To read

the statute otherwise would run counter to the JRA's goal of reducing the State's prison

---

[20] Notably, as introduced, S.B. 1005's definition for "technical violation" largely mirrored the JRCC's proposed definition, except that in committee, the definition for a "technical violation" was amended to add the term "absconding." S. Judicial Proceedings Comm., Comm. Report on S.B. 1005, 436th Sess. (Md. 2016). The committee also amended the bill to include the provisions that defined "absconding" as "displaying affirmative behavior with the intent to evade supervision" but not "miss[ing] a single appointment with a supervising authority." *Id.* As amended, the bill passed the Senate and was sent to the House. S. Judicial Proceedings Comm., Comm. Voting Record on S.B. 1005, 436th Sess. (Md. 2016).

In the House Judiciary Committee, the bill received a favorable report with amendments to, among other things, the definition of the term "absconding." The House Committee's proposed language defined absconding as "willfully evading supervision" but not "missing a single appointment with a supervising authority." H. Judiciary Comm., Comm. Report on S.B. 1005, 436th Sess. (Md. 2016). As amended, the bill passed the House. A Conference Committee was appointed following the Senate's refusal to concur with the House Committee's amendments. The Conference Committee's recommended form of S.B. 1005, which the General Assembly adopted, included the House Committee's definition for "absconding." Conference Committee, Conference Comm. Report on S.B. 1005, 436th Sess. (Md. 2016).

23

population of those probation violators who had been reincarcerated for "missing a treatment appointment or failing a drug test." *See JRCC Final Report* at 19. Albeit, the General Assembly was also careful to specify that applicability of the limits on the period of incarceration for a technical violation is a "rebuttable presumption." Should a court find, after consideration of certain factors, that a probationer's departure from a drug treatment facility poses a danger to public safety, a victim, or a witness, then pursuant to CP § 6-223(d)(3), the court may depart from the presumptive incarceration limits. 2016 Md. Laws ch. 515. Repeat violations are addressed through the graduated incarceration periods contained in CP § 6-223(d)(2), which also permit the court to impose any sentence that might originally have been imposed following a fourth technical violation.

### D. Case Law

This Court's decision in *Dixon v. State* is also instructive in our analysis of CS § 6-101(b). There, the issue on appeal was whether the DPP had a common-law tort duty to protect Dixon from harm by a state prisoner released on mandatory supervision. 205 Md. App. 505, 507-08 (2012). Although the issue in *Dixon* is distinct from the statutory interpretation issue in the instant matter, our decision in *Dixon* necessarily required a general understanding of the supervisory functions of the Maryland Department of Public Safety and the Department of Correctional Services involved in that case. *Id*. at 508. Accordingly, we explained that the Division of Corrections ("DOC"), the Maryland Parole Commission ("MPC"), and the DPP each play a role "in the confinement, conditional release, and *supervision* of convicted criminals." *Id*. at 507-08. (Emphasis added). We elaborated that while confinement and conditional release were responsibilities of the DOC

and MPC, respectively, "DPP is responsible for supervising the post-incarceration conduct of parolees[,] [] individuals released on mandatory supervision[,]" and probationers.[21] *Id.* at 508, 518-20. *See also Costa v. State*, 58 Md. App. 474, 481-82 (1984) ("In Maryland, if a sentencing judge elects to impose general conditions upon a probationer, *the probation authority*, *in furtherance of its supervisory role to assure compliance*, may provide specific rules designed to govern the conduct of the probationer within the ambit of the condition.") (emphasis added)).[22]

---

[21] The DPP is responsible for supervising parolees and individuals released pursuant to CS § 6-104, and for supervising probationers pursuant to CS § 6-111. *Dixon*, 205 Md. App. at 508, 518-19.

[22] In 2006, the United States Department of Justice's Bureau of Justice Assistance, in partnership with the Pew Charitable Trusts and other organizations, launched the Justice Reinvestment Initiative ("JRI"). BUREAU OF JUSTICE ASSISTANCE, JUSTICE REINVESTMENT INITIATIVE (last visited July 18, 2019), https://perma.cc/45MJ-6PAV [hereinafter BUREAU OF JUSTICE ASSISTANCE]; THE PEW CHARITABLE TRUSTS, 35 STATES REFORM CRIMINAL JUSTICE POLICIES THROUGH JUSTICE REINVESTMENT (July 2018), https://perma.cc/4W52-B2DV. "Through a consortium of technical and policy experts, JRI provides policymakers with resources and tools to increase public safety, hold offenders accountable, and control corrections and costs, resulting in a more effective justice system." BUREAU OF JUSTICE ASSISTANCE. Many states, including Maryland, have implemented Justice Reinvestment legislation with the guidance of the JRI. *JRCC Final Report* at 4. Significantly, in its Final Report, the JRCC noted the success of Justice Reinvestment reforms in other jurisdictions, and considered their varying approaches to research and policy in implementing their own Justice Reinvestment laws.

Not surprisingly, Brendoff brings to our attention a 2018 North Carolina Court of Appeals' decision interpreting the definition of "absconding" under North Carolina's Justice Reinvestment Act of 2011. *State v. Melton*, 811 S.E.2d 678, 680 (N.C. Ct. App. 2018). There, the trial court found that Melton violated her probation by absconding within the meaning of North Carolina's JRA, revoked her probation, and executed her previously suspended sentences. *Id*. at 680. The statute at issue in *Melton* permits a trial court to revoke probation when, among other things, a defendant "*absconds by willfully avoiding supervision or by willfully making her whereabouts unknown to the supervising probation officer*[.]" *Id*. at 680-81 (emphasis added). As in the instant case, it was not until the

For all of these reasons, we hold that when a prisoner is placed on supervised probation upon admission into a drug and alcohol treatment facility pursuant to an order issued under HG § 8-507, the DPP, which includes the assigned probation agent, is the probationer's "supervising authority" for purposes of ascertaining whether the probationer has absconded within the meaning of CS § 6-101(b).

## II.

### Revocation of Probation

Having concluded that the DPP is the supervising authority referred to by the terms

---

enactment of North Carolina's JRA that the term "abscond" was statutorily defined. *Id.* "This change was in line with the JRA's purpose to be 'part of a national criminal justice reform effort' which, among other changes, 'made it more difficult to revoke offenders' probation and send them to prison." *Id.* (citation omitted). Accordingly, the Court interpreted the statute's definition of "abscond," and held that "a defendant *absconds* when he willfully makes his whereabouts unknown to his probation officer, and the probation officer is unable to contact the defendant." *Id.* at 681. (citation omitted).

As the State properly observes, however, *Melton* has limited application here because North Carolina's definition of absconding identifies the supervising authority as the probation officer. Nevertheless, *Melton* and other out-of-state cases interpreting the term "absconding" under their own Justice Reinvestment laws are helpful in understanding Maryland's JRA, which grew out of the same nationwide initiative. *See e.g.*, *Legendre v. State*, 242 So.3d 1028, 1030 (Ala. Crim. App. 2017) (interpreting a statute permitting courts to revoke probation and execute a sentence exceeding the statutorily capped period of incarceration when a violator "*absconds*" as requiring proof that the violator sought to evade the legal process, "not simply that [he] failed to attend one meeting with a probation officer or *could not be located for a brief period of time*" (emphasis added) (citation omitted); *State v. Dooley*, 423 P.3d 469, 479-80 (Kan. 2018) (interpreting a statute allowing courts to bypass the graduated sanctions scheme when a probation violator "*absconds from supervision*" as requiring the State to show that probationer intentionally avoided probation supervision, "for example, *by intentionally avoiding detection by one's probation officer*" (emphasis added)); *Hobson v. State*, 230 So.3d 1096, 1099 (Miss. 2017) (explaining that the statute authorizing courts to revoke probation and "impose any or all of the remainder of the suspended sentence" when a probation violator "*abscond*[s] *from supervision*," defines "absconding" as "the *failure of a probationer to report to his supervising officer* for six (6) or more consecutive months" (emphasis added) (citation omitted)).

"supervision" and "supervising authority" contained in CS § 6-101(b), we shall next address whether the circuit court erred in finding that Brendoff violated the conditions of his 2016 Probation Order by "absconding."

The Court of Appeals has established that "a revocation of probation hearing is a civil proceeding, in which the probationer is not cloaked with the full panoply of constitutional rights and procedural safeguards enjoyed by a defendant in a criminal cause." *Hammonds*, 436 Md. at 36 (internal quotations omitted). A court's determination on the question of whether to revoke probation typically involves two inquiries: "(1) a retrospective factual question whether the probationer has violated a condition of probation; and (2) a discretionary determination by the sentencing authority whether a violation of a condition warrants revocation of probation." *Id*. at 31 (internal quotations omitted). Under the first inquiry, "the hearing judge must find the essential facts comprising a violation of a condition by a preponderance of the evidence." *State v. Dopkowski*, 325 Md. 671, 677 (1992) (internal quotations omitted). We review the court's determination on this first inquiry for clear error. *Id*.; *see also Wink v. State*, 317 Md. 330, 341 n.1 (1989) (noting that, if the appellate court agrees with the defendant that certain inferences were improperly drawn from the facts, "the clearly erroneous rule would offer a satisfactory explanation of the reversal"). "With respect to the second [inquiry], that of whether the court's discretion should be exercised to revoke probation, appellate review is for an abuse of discretion." *Dopkowski*, 325 Md. at 677 (internal quotations omitted).

As discussed above, the JRA enacted new laws that distinguish between technical and non-technical violations of probation and establish a progressive disciplinary scheme

27

that presumptively limits periods of incarceration for "technical violations." CP § 6-223(d)(2)(i). "Absconding" is a non-technical violation of probation that involves "willfully evading supervision," though it "does not include missing a single appointment with a supervising authority." CS § 6-101(b), (m). Accordingly, when there is an allegation of a non-technical violation of probation by "absconding," then the first inquiry in the court's determination (a factual determination as to whether a probationer has violated a condition of probation), is an assessment of whether the probationer willfully evaded his or her supervising authority. This is an "*essential fact*[] comprising a violation of a condition" of probation that the hearing judge must find by a preponderance of the evidence. *Dopkowski*, 325 Md. at 677 (emphasis added).

The circuit court erred in the underlying case by implicitly treating the drug treatment facilities as the supervising authorities when the court found that Brendoff committed a non-technical violation of his probation by walking away from Jude House and missing six required appointments at New Life. As we have established, Brendoff was under the supervision of the DPP, which included his probation agent, not the residential treatment facilities to which he was committed under the HG § 8-507 order. Because the court failed to recognize that the DPP was the supervising authority for purposes of determining whether he absconded under CS § 6-101(b), the court's factual determination that Brendoff committed a violation of his probation was in error. This was an incorrect application of the statute, and contrary to the purpose of the JRA, which applies presumptive incarceration limits to failures to complete drug treatment on first and second violations. To conclude that Brendoff absconded, the court must find, on the record, that

28

Brendoff willfully evaded the supervision of the DPP, not merely that he left the treatment facility.

Accordingly, we vacate the court's revocation of probation and remand the case to the circuit court to determine whether Brendoff absconded in violation of his probation by "willfully evading [the] supervision" of the DPP and his probation agent.

**JUDGMENTS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ANNE ARUNDEL COUNTY TO PAY COSTS.**